UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ACCES DREDGING, LLC,

Plaintiff,

v.

Case No. 24-cv-10704
HON. MARK A. GOLDSMITH

DTM GEN6 PROPPANTS, LLC, et al.,

Defendants.
_________________________________/

**OPINION & ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. 37)**

The central dispute in this case is whether Defendants have any obligation to pay for repair work performed by Plaintiff Acces Dredging, LLC during the course of dredging operations that Acces was retained by DTM to undertake.[1] Acces's amended complaint asserts three claims for relief: (i) open account under La. Rev. Stat. § 9:2781, (ii) breach of contract, and (iii) quantum meruit/unjust enrichment. See Am. Compl. (Dkt. 10). At bottom, the parties dispute whether an agreement covering the type of repair work that Acces performed existed.

Before the Court is DTM's motion for summary judgment on all claims. (Dkt. 37). For the reasons discussed below, the Court grants the motion in part and denies it in part.[2]

[1] The Defendants in this case are DTM Gen6 Proppants, LLC, DT Midstream Holdings, LLC, and DT Midstream, Inc. This opinion will collectively refer to them as DTM.

[2] DTM filed a motion for summary judgment (Dkt. 37). Acces filed a response (Dkt. 39) and DTM filed a reply (Dkt. 40). Because oral argument will not aid the Court's decisional process, the motion will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b).

## I. BACKGROUND

DTM owns and operates a quarry in Mansfield, Louisiana. Am. Comp. ¶ 5. In April 2022, DTM engaged in discussions with Acces to provide a "master and crew" to operate its 2019 Custom Dredge to dredge and produce sand from the quarry for processing and sale. Id. ¶¶ 6-7. As part of those discussions, DTM informed Acces that it would require the parties to enter into a Master Service Agreement (MSA). Vierra Decl. at PageID.305 (Dkt. 39-2). On May 19, 2022, DTM provided Acces with its standard MSA form. Id.

As the parties continued discussions, Acces sent DTM's director of operations, Britt Mitchell, a letter dated June 14, 2022, setting forth a "proposal for an agreement whereby [Acces] will furnish the master and crew to dredge for sand." See 6/14/22 Proposal at PageID.320 (Dkt. 39-3). In relevant part, the Proposal provided a "Pre-Work Inspection, Maintenance and Trial" provision which stated, among other things, that "Acces will perform such repairs and maintenance to the Dredge for which Acces is qualified." Id. at PageID.322. According to the Proposal, repairs and maintenance were included as part of Acces's "Readiness Services" for the purpose of readying the dredge for operations. Id. Acces proposed that it would charge DTM "a fee of Three Hundred and Sixty Dollars ($360.00) per hour for each Acces employee performing Readiness Services, plus Acces's reasonable expenses." Id.

On June 15, 2022, Acces submitted its proposed revisions of the MSA to DTM. Id. From June through July 2022, DTM and Acces discussed revisions to both the Proposal and MSA. Am. Compl. ¶ 15. On July 14, 2022, Acces submitted a revised Proposal for DTM's review. The revised Proposal included the same "Readiness Services" provision, which included repairs and costs. See 7/14/22 Proposal, at PageID.333. On that same day, Acces also sent DTM an invoice for $50,000 in Readiness Services, among other fees. Id. at PageID.331-337. On July 19, 2022,

DTM provided its proposed edits and comments to the revised Proposal. See 7/18/22 Readiness Services Invoice email at PageID.327 ("Attached please find DTM's comments and proposed edits to [the SOW for the Readiness Services and MSA]"). DTM did not acknowledge the July 14 invoice in its email. On July 27, 2022, Acces sent DTM a new invoice for a $50,000 retainer fee and $14,300 for survey costs. Am. Compl. ¶ 24.

On July 29, 2022, the parties executed the MSA titled "Acces Dredging-DTM Negotiated Terms and Conditions for Services." See MSA at PageID.235 (Dkt. 37-3). Relevant to this litigation, the MSA termed Acces's performance as the "Work" and defined it as "the services and labor to be performed and equipment and materials to be furnished by [Acces] to fulfill [Acces's] obligations under the Agreement, including all repairs or replacements under any warranty." Id. at PageID.220. The Agreement included an integration clause under Section 59 representing the parties' entire agreement:

> A. The Agreement represents the entire agreement between [DTM] and [Acces] respecting the Work and no modification of the Agreement shall be effective unless made by a Change Order. Any agreements, negotiations, or understandings of the parties **prior to or contemporaneous to the date of the Agreement, whether written or oral, are superseded** hereby.
>
> B. Any document submitted by [Acces] (including any [Acces] document referenced in the Agreement) is used solely for the purpose of describing the work and to the extent containing any terms in addition to or inconsistent with the terms of the Agreement, or a rejection of any terms of the Agreement, shall be deemed to be a counteroffer to [DTM] and shall not be binding upon [DTM] unless specifically accepted in writing by Company Representative. In the absence of written acceptance of such counteroffer by [DTM] commencement of performance by [Acces] shall be deemed to be an agreement by [Acces] to perform in accordance with terms of the Agreement and an acceptance hereof, notwithstanding any prior dealings or usage of trade.

Id. at PageID.234 (emphasis added).

The MSA defined "Change Order" as "the document issued by the authorized Company Representative that modifies the Agreement." Id. at PageID.220.

Also on July 29, Acces submitted a second revised Proposal (the July 29 Proposal) to DTM. Vierra Decl. at PageID.308. According to Acces's owner, Christynn Vierra, Mitchell represented that the July 29 Proposal was acceptable and would be presented to DTM's vice president for signature. Id. at PageID.309. Vierra further averred that "Mitchell authorized Acces to commence rendering Readiness Services pursuant to the term of the Proposal." Id. at PageID.310. The parties agree that DTM's vice president never signed the July 29 Proposal.

In its briefing, DTM acknowledges that "the parties did negotiate terms regarding the minimum monthly fee to be paid to Acces and a rate for the production of sand, and DTM performed consistent with the parties' course of dealing on those payment terms." Mot. at PageID.186. According to Vierra, "DTM would pay Acces $2.00 per ton of Product dredged from the Quarry. Further, for each calendar month during the contract term, DTM would pay Acces a minimum fee of $110,000 per month in advance." Vierra Decl. at PageID.306. None of these payment terms appear in the MSA.

On August 1, 2022, DTM paid the invoice dated July 27, 2022. Am. Compl. ¶ 25. From August 4 to December 9, 2022, Acces sent DTM invoices for minimum fees and production through the months of August, September, October, and November. See Invoices at PageID.356-366 (Dkt. 39-11; 39-12; 39-13; 39-14; 39-15). They included no amounts for repairs. The parties agree that DTM paid these invoices. Mot. at PageID.179-180; Resp. at PageID.285.

Acces alleges that from September to November, "the Dredge persistently malfunctioned and required repairs." Am. Compl. ¶ 46. Acces alleges that "DTM authorized Acces to perform repairs on the Dredge during the months of September, October, and November 2022." Id. ¶ 47. According to Acces's vice president Keith Marks, "when a malfunction arose and a need for repairs occurred, [he] would contact DTM management." Marks Decl. at PageID.494-495 (Dkt. 39-19).

"On these occasions [Jeremy Britt Mitchell or Ray Hargrove, DTM's plant manager] would authorize Acces to perform the repairs." Id. at PageID.495. Marks further averred that "[a]t times, repairs required the engagement of a third party service repair contractor." Id. at PageID.495. When Acces employees spent time aiding or facilitating third party access to the dredge for such repairs, Acces billed DTM for the time Acces personnel spent performing such supporting roles. Id. at PageID.495-496. Mitchell testified at his deposition that he did not recall discussing repairs or repair charges with anyone from Acces. Mitchell Dep. at PageID.519 (Dkt. 40-2). The record does not show that DTM issued a change order for any repairs, nor do the parties state that a change order was issued. Additionally, DTM does not dispute that it authorized Acces to perform repairs on the dredge.

In November 2022, DTM gave Acces verbal notice of its termination of the MSA. Am. Compl. ¶ 41. Acces then terminated its services at the end of November. Id. ¶ 42. Acces provided DTM with its last invoice on December 9, 2022, which DTM paid. Id. ¶¶ 44-45. Vierra averred that upon Mitchell's instruction, Acces "gathered information concerning the time its employees had spent performing repairs." Vierra Decl. at PageID.315. Acces claimed that it submitted a spreadsheet detailing the repair hours and costs to DTM on December 9, 2022. Id. at PageID.316; see Draft 12/9/22 Email with Spreadsheet at PageID.464 (Dkt. 39-17). DTM contends that they never received any email with such a spreadsheet. See Aff. of Steven Motts, PageID.259-260 (Dkt. 37-8). Vierra averred that she and Mitchell continued discussions on repair work and billing from January through February 2023. Vierra Decl. at PageID.316-317.

On March 4, 2023, counsel for Acces sent a letter to DTM requesting payment for the repair services. 3/4/23 Letter to DTM at PageID.251-252 (Dkt. 37-5). The letter stated that the parties agreed to readiness services and Acces spent 565.3 hours in September, 685 hours in October, and

496 hours in November performing repairs on the dredge. Id. at PageID.251. He included invoices for the months of September, October, and November, which reflected – unlike invoices for those months that were sent earlier—amounts claimed for repairs. On May 2, 2023, DTM responded that it did not owe $628,688 in repair fees pursuant to an unexecuted Readiness Agreement. 5/2/23 Letter to Acces at PageID.254 (Dkt. 37-6). DTM disputed that it was responsible for the alleged repairs and further argued that the invoice for repair services was untimely under Section 30 of the MSA, which provided that "invoices, statement of charges or service receipts (as applicable) for Work performed shall be submitted by [Acces] on a timely basis[.]" Id. The present litigation followed.

## II. ANALYSIS [3]

### A. Breach of Contract

DTM first argues that it is entitled to summary judgment because it never signed any agreement authorizing Acces to perform repair work at additional cost to DTM, and that the MSA's integration clause superseded any prior or contemporaneous agreements. Mot. at PageID.185. Acces disagrees, arguing that an agreement for repairs existed because DTM assented to Acces's terms in the July 29 Proposal and acted in accordance with those terms after the parties executed the MSA. Resp. at PageID.292-293. Alternatively, Acces asserts that the parties entered into a

[3] In assessing whether a party is entitled to summary judgment, the Court applies the traditional summary judgment standard as articulated in Scott v. Harris, 550 U.S. 372, 380 (2007). A court will grant a motion for summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the movant makes an initial showing that there is an absence of evidence to support the nonmoving party's case, the nonmovant can survive summary judgment only by coming forward with evidence showing there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324–325 (1986).

subsequent oral agreement for repairs, which is not barred by the integration clause. Id. at PageID.293-295.

The Court agrees with DTM that the MSA does not cover the alleged repairs performed by Acces. However, the Court finds that Acces has presented sufficient evidence to support a jury finding that the parties entered into a separate oral agreement for repairs to the dredge after the execution of the MSA.

**1. MSA**

The Court agrees that the MSA precludes any consideration of the July 29 Proposal as evidence of a written agreement for repairs. The parties signed the MSA on July 29, 2022. See MSA at PageID.235. The MSA contains an express integration clause, stating in relevant part, that "[t]he Agreement represents the entire agreement between [DTM] and [Acces] [and] [a]ny agreements, negotiations, or understandings of the parties prior to or contemporaneous to the date of the Agreement, whether written or oral, are superseded hereby." Id. at PageID.243.

The MSA is governed by Michigan law. Id. at PageID.234. Under Michigan law, "an integration clause precludes admission of parol evidence that contradicts the written agreement." UAW-GM Human Resource Ctr. V. KSL Recreation Corp., 579 N.W.2d 411, 417 (Mich. Ct. App. 1998); see also Novak v. Nationwide Mut. Ins. Co., 599 N.W.2d 546, 553 (Mich. Ct. App. 1999) ("[T]he written contract, with its integration clause, expressly contradicted [certain alleged promises,] making plaintiff's alleged reliance on these statements unreasonable."). In other words, parol evidence of prior or contemporaneous collateral agreements is not admissible to contradict or vary the terms of the parties' written agreement that is clear and unambiguous. UAW–GM Human Resource Ctr., 579 N.W.2d at 414. "By limiting the contract to the provisions that are in writing, the parties are definitely expressing an intention to nullify antecedent understandings or

agreements," and they "are making the document a complete integration." Id. at 415 (quotation marks and citation omitted). Thus,

> [s]ince it is only the intention of the parties to adopt a writing as a memorial which makes that writing an integration of the contract, and makes the parol evidence rule applicable, any expression of their intention in the writing in regard to the matter will be given effect. If they provide in terms that the writing shall be a complete integration of their agreement . . . the expressed intention will be effectuated.

Id. at 414.

The parties negotiated the terms of the Proposal from June through July 2022. On July 29, 2022, the same day the parties executed the MSA, Acces sent the final version of the Proposal for DTM's signature. Vierra Decl. at PageID.308. The Proposal was never signed by a DTM representative, nor was it incorporated by reference in the MSA. Acces contends that it and DTM had an understanding that the Proposal provided for Acces's "Readiness Services," which included repairs and costs. 7/29/22 Proposal, at PageID.349. However, the inclusion of an integration or merger clause in a written agreement precludes the admission of evidence of any prior or contemporaneous parol agreements, because the purpose of such a clause is to extinguish all contemporaneous or antecedent agreements. UAW–GM Human Resource Ctr., 579 N.W.2d at 417. Because the Proposal was negotiated prior to and/or contemporaneous with the MSA, the MSA supersedes the Proposal. The integration clause prohibits the Court from considering the Proposal as evidence of the parties' written agreement for repairs.

The Court next turns to whether the MSA provided for the type of repairs Acces performed. Because the MSA is the executed agreement, Acces must prove that DTM's failure to pay for repairs constituted a breach under the MSA. "To recover for breach of contract under Michigan law, a plaintiff must [demonstrate]: (1) the existence of a contract; (2) the terms of the contract; (3) that the defendant breached the contract; and (4) that the breach caused the plaintiff's injury."

Derbabian v. Bank of Am., N.A., 587 F. App'x 949, 953 (6th Cir. 2014). The "cardinal rule" in contract interpretation is to determine the parties' intent. City of Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool, 702 N.W.2d 106, 113 (Mich. 2005). To ascertain intent, courts read the agreement as a whole, according to its plain and ordinary meaning. Old Kent Bank v. Sobczak, 620 N.W.2d 663, 667 (Mich. Ct. App. 2000); see also Wilkie v. Auto-Owners Ins. Co., 664 N.W.2d 776, 780 (Mich. 2003).

Acces cannot show that DTM breached a term of the MSA by failing to pay for the alleged repairs. Under the MSA, Acces was to perform the "Work," defined as "the services and labor to be performed and equipment and materials to be furnished by [Acces] to fulfill [Acces's] obligations under the Agreement, including all repairs or replacements under any warranty." MSA at PageID.220 (emphasis added). No party has contended that any repairs that are the subject of the lawsuit were covered under a warranty. The MSA, as written, does not address the repairs for which Acces has claimed breach of contract.

Thus, to the extent Acces is alleging that DTM breached an obligation under the proposals Acces made or under the MSA to pay for repairs that Acces was allegedly obligated to make, such claims fail as a matter of law. DTM's motion for summary judgment is granted as to any breach of contract claims based on the MSA or the proposals

**2. Separate Oral Agreement**

Alternatively, Acces claims that "it seeks to enforce DTM's obligations to pay for repair services DTM authorized after DTM contracted with Acces to engage Acces to operate DTM's Dredge." Resp. at PageID.293 (emphasis in original). DTM argues that "there was no signed agreement separate from the Contract which would have been required to change the Contract terms." Mot at PageID.186. Although the MSA does not provide that DTM was obligated to pay

for the alleged repairs, the record supports an inference that the parties entered into a subsequent oral agreement for repairs to the dredge not covered by the MSA. Therefore, the Court is not persuaded that DTM is entitled to summary judgment on the argument that there was never any agreement that Acces would perform repair services for which it would be compensated.

The elements of a valid contract are the following: "(1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." Hess v. Cannon Twp., 696 N.W.2d 742,748 (Mich. Ct. App. 2005) (punctuation modified). Mutuality of agreement is mutual assent, or in other words, a "meeting of the minds on all the essential terms." Kloian v. Domino's Pizza, LLC, 733 N.W.2d 766, 770 (Mich. Ct. App. 2006). "Where the subject-matter does not require the contract to be written, oral agreements are as effective as written ones." Yaldo v. Toyota Motor Sales USA, Inc., No. 308600, 2014 WL 61129, at *4 (Mich. Ct. App. Jan. 2, 2014) (quoting Strom–Johnson Constr Co v. Riverview Furniture Store, 198 NW 714, 718 (Mich. 1924)).

Here, there is a question of fact, based on the record, whether the parties orally agreed that Acces would perform repair services on the dredge for which it would be compensated. The record shows that from September to November 2022, the dredge often malfunctioned and required repairs. Vierra Decl. at PageID.315. Acces provided detailed documentation of these malfunctions in its Levermen reports, which were prepared daily by Acces's crewmembers while on the job at DTM's quarry and recorded the start and stop times for each activity each employee performed while on site. See Levermen Reports at PageID.368-462 (Dkt.39-16). Marks averred that "when a malfunction arose and a need for repairs occurred, [he] would contact DTM management." Marks Decl. at PageID.494-495. "On these occasions [Jeremy Britt Mitchell or Ray Hargrove, DTM's plant manager] would authorize Acces to perform the repairs." Id. at PageID.495. Vierra

also testified that when DTM was unable to perform the repairs, "they asked us for help, that is when we completed the repair work, and what we billed them for in the repair work." Vierra Dep. at PageID.249. The Levermen reports support that DTM knew that the dredge needed repair work and met with Acces to discuss performing repairs. See Levermen Report at PageID.403 ("Meet with Ray [Hargrove] about doing process correctly. And we then went back to work on Dredge. Fixing it the right way."). The reports further show that Acces performed the repairs as needed. Id. at PageID.391, 400, 409. 427, 432, 460 (non-exhaustive list of reports detailing when dredge was down and repairs were performed). In its briefing, DTM does not dispute that it authorized Acces to perform these repairs. According to Marks, "[a]t all times, Acces expected to be paid for the work its employees did to repair the dredge." Marks Decl. at PageID.495.

Vierra averred that after DTM notified Acces of its intent to terminate the contract, "Acces consulted with Mitchell about how to invoice DTM for the repair services Acces performed on the Dredge." Vierra Decl. at PageID.315. Vierra prepared a spreadsheet for repairs by cross-referencing payroll records with the Levermen reports "detail[ing] the start and stop times for each activity and explanations of the activities performed by Acces's crewmembers" to determine the hours spent on repairs. Id. Vierra averred that she sent this spreadsheet to Mitchell on December 9, 2022, and he provided feedback and further instruction. Id. at PageID.316. She and Mitchell continued discussions on repair work and billing from January through February 2023. Id. at PageID.316-317. Mitchell testified at his deposition that he did not recall receiving the December 9 email with the spreadsheet. Mitchell Dep. at PageID.263. Nor did he recall having discussed with Vierra repairs and billing. Id.

Based on the evidence presented, a genuine dispute of material fact remains as to whether the parties entered into a separate oral agreement for Acces to perform repairs on the dredge after

the MSA had been executed. A jury must decide whether there was an agreement and what the terms were. Ponder v. Wild, No. 23-5620, 2024 WL 327802, at *2 (6th Cir. Jan. 29, 2024) (agreeing that the existence of a contract is a question of fact for the jury when the facts supporting or opposing the contract are disputed); Bullock v. Automobile Club of Mich., 381 N.W.2d 793 (Mich. Ct. App. 1985) (existence and terms of oral agreement are generally a question of fact).

**3. Timeliness of Invoices & Actual Damages**

DTM argues that summary judgment on the breach of contract claim is appropriate for two other reasons. DTM contends that even if "Acces had a contractual right to claim payment for repair work beyond the work DTM contracted Acces to perform, Acces completely failed to transmit the invoices for that alleged work in a timely manner" as provided under the MSA. Mot. at PageID.186. DTM also argues that "even if Acces could prove that DTM agreed to repair charges, and Acces could show that it calculated those charges accurately and reliably (Acces can do neither), it has no actual damages" because Acces paid its employees the same rates regardless of whether they were allegedly performing repairs or simply waiting on the job. Id. at PageID.190. DTM is not entitled to summary judgment based on either of these arguments.

As for timeliness of the invoices, the Court has determined there is a genuine dispute of fact as to whether the parties entered into a separate oral agreement for repairs. DTM's reliance on the MSA to support its argument is misplaced, because the MSA does not govern the parties' separate oral agreement for repairs. No party has presented evidence that the oral agreement included an understanding as to when invoices would be presented. In the absence of such evidence, summary judgment on this basis would not be appropriate.

As for damages, there is sufficient evidence in the record supporting that Acces incurred damages. DTM's argument is that Acces did not pay its workers any additional amounts because

of repairs they performed. But this is myopic. A project that takes longer to complete because the dredge was down meant more days that workers were paid for ultimately producing the same tonnage of sand, thereby making the project less profitable. Acces made its money through its production of sand. Vierra Dep. at PageID.249. When the dredge was down, and sand could not be produced for sale, that "cost [Acces] lots of profits because the dredge was not properly maintained." Id. at PageID.247. Vierra testified that she expected that Acces would be compensated for the repairs performed because Acces "had an agreement with DTM that [DTM] [was] financially responsible to do the repair work" and performing "repair[s] is not time that [Acces was] in production." Id. at PageID.248-249. Because there is some record evidence supporting that Acces suffered financial loss from performing the repairs, summary judgment is not appropriate on this ground.

**B. Open Account**

DTM argues for summary judgment on the open account claim because there was no enforceable agreement, Mot. PageID.1386, and no timely invoices, Mot. PageID.1388. As discussed above, neither proposition is sustainable at this summary judgment stage. Therefore, DTM's attack on the open account claim fails too.

**C. Quantum Meruit & Unjust Enrichment**

Lastly, DTM argues that it is entitled to summary judgment on Acces's alternative quasi-contractual theories of quantum meruit and unjust enrichment. Specifically, DTM argues that these alternative theories fail, because "Acces cannot prove by any reliable measure what repairs were performed and how many hours were actually spent." Mot. at PageID.188. Nor can "Acces prove that DTM received a benefit for which it hasn't already paid Acces." Id. at PageID.187. In the

reply, DTM also argues that the quasi-contractual claims do not apply if there is an express contract. Reply at PageID.513.

"Quantum meruit is an equitable doctrine generally applied to prevent unjust enrichment." Idalski v. Crouse Cartage Co., 229 F. Supp. 2d 730, 740 (E.D. Mich. 2002). Unjust enrichment is defined as one party's "unjust retention of money or benefits which in justice and equity belong to another." Tkachik v. Mandeville, 790 N.W. 260, 266 (Mich. 2010) (punctation modified). To succeed on "a claim of quantum meruit or unjust enrichment, a plaintiff must establish (1) the receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant." Morris Pumps v. Centerline Piping, Inc., 729 N.W. 898, 904 (Mich. Ct. App. 2006). "When successful, the court will 'imply a contract' and require the defendant to disgorge any unjustly retained benefit as restitution." P.R.A. Co. v. Arglass Yamamura SE, LLC, 768 F. Supp. 3d 862, 872 (E.D. Mich. 2024) (applying Michigan law).

Whether these quasi-contractual theories are available to Acces based on the reliability of its repair calculations is an issue more appropriate for trial. Acces submitted the Levermen reports detailing when repairs were performed and a spreadsheet summarizing repair hours and costs. See Levermen Reports at PageID.368-462; 12/9/22 Spreadsheet at PageID.465. Vierra also testified about how she derived the repair costs as well as the financial loss experienced because of the time spent performing repairs instead of dredging. Vierra Dep. at PageID.246-247, 249. Based on this evidence, the Court concludes that DTM's dispute of Acces's repair calculations is an issue of fact for a jury.

Additionally, DTM's argument that these quasi-contractual claims are barred by the existence of an express agreement is premature. "A plaintiff may seek equitable relief as the alternative to a breach of express contract claim if the defendant has disputed, or not yet foreclosed

disputing, the existence of the contract." Red Star Constr. Grp., LLC v. Odin Props., LLC, No. 2:23-CV-12341, 2025 WL 3111020, at *7 (E.D. Mich. Nov. 6, 2025) (citing Solo v. United Parcel Serv. Co., 819 F.3d 788, 796–97 (6th Cir. 2016)); see also Bloomer v. Word Network Operating Co., Inc., 785 F. Supp. 3d 251, 272 (E.D. Mich. 2025) (denying summary judgment on the equitable relief claims because the jury could find that there was no contract).

At this stage, the existence and terms of the parties' oral agreement remains unknown, and DTM disputes that the parties had an agreement for repairs. Therefore, Acces is not foreclosed, at this stage, from proceeding with both claims. DTM is not entitled to summary judgment on these claims.

## III. CONCLUSION

For the reasons explained above, the Court grants the motion for summary judgment on any breach of contract claims based on the MSA or Acces's proposals but denies it with respect to Acces's breach of contract claim based on a separate oral agreement. The Court also denies DTM's challenges to the open account and quasi-contract claims.

**SO ORDERED.**

Dated: September 24, 2026
Detroit, Michigan

s/Mark A. Goldsmith
MARK A. GOLDSMITH
United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 24, 2026.

s/Joseph Heacox
JOSEPH HEACOX
Case Manager